UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

                                                    Case No. 10-20535
                        Plaintiff,                  Honorable David M. Lawson

v.

BOBBY W. FERGUSON, MICHAEL
WOODHOUSE, CALVIN L. HALL,
FERGUSON ENTERPRISES, INC.,
XCEL CONSTRUCTION SERVICES,
INC., and A & F ENVIRONMENTAL/
JOHNSON CONSTRUCTION SERVICES,

                        Defendants.
_____/

## OPINION AND ORDER DENYING MOTIONS TO DISMISS, SEVER, AND FOR PRODUCTION OF GRAND JURY AND *BRADY* MATERIAL

         The defendants are charged with various offenses concerning the formation and execution of contracts for the development of a phase of a federal housing project.  The grand jury has alleged that the defendants manipulated bids for the project so they could overcharge, that they laundered the money they may have received as proceeds, and that they illegally dumped materials at the building site.  The defendants contend that their part of the project — development of the infrastructure — did not involve the expenditure of any federal funds and therefore the Court has no subject matter jurisdiction, so the case must be dismissed.  Some of the defendants also have moved to compel discovery and for severance.  The Court heard oral argument on all of these motions on December 22, 2011 and now concludes that the motions should be denied.

I.  Facts and proceedings

Defendants Bobby Ferguson, Calvin Hall, Michael Woodhouse, Ferguson Enterprises, Inc., Xcel Construction Services, Inc., A&F Environmental/Johnson Construction Services, and Shakib Deria are charged in an eight-count indictment. The indictment charges defendants Ferguson, Ferguson Enterprises, Woodhouse, Hall, and Xcel Construction Services with conspiracy to defraud the United States, in violation of 18 U.S.C. § 371 (Count One) and conspiracy to commit mail fraud, in violation of 18 U.S.C. §§ 1341 and 1349 (Count Two); defendants Ferguson, Woodhouse, Hall and Xcel Construction Services with conspiracy to launder monetary instruments, in violation of 18 U.S.C. § 1956 (Count Three); defendants Ferguson, Woodhouse, Ferguson Enterprises, and Xcel Construction with conspiracy to wilfully injure property of the United States, in violation of 18 U.S.C. §§ 1361 and 371 (Count Four); defendant Ferguson with two counts of being a felon in possession of a firearm, in violation of 18 U.S.C. §§ 922 and 924 (Counts Five and Seven) and, along with defendant Deria, conspiracy to obstruct justice, in violation of 18 U.S.C. §§ 1503 and 371 (Count Six); and defendants Ferguson, Deria, Ferguson Enterprises, and A&F Environmental/Johnson Construction Services with conspiracy to structure financial transactions, in violation of 31 U.S.C. § 5324 and 18 U.S.C. § 371 (Count Eight).

The following facts are taken from the indictment, which the defendants dispute in many material respects. Defendant Bobby Ferguson owned and operated defendant Ferguson Enterprises, Inc. In 2002, defendant Ferguson formed Johnson Construction Services, Inc., which embarked on a joint venture in May 2003 to form defendant A&F Environmental/Johnson Construction Services. Also in 2002, defendant Ferguson formed Xcel Construction services. Defendant Ferguson named defendant Woodhouse as president of defendant Xcel Construction Services in 2006.

-2-

Garden View Estates (GVE) was a housing development located on the site of the former Herman Gardens housing project. GVE was a joint project of the United States Department of Housing and Urban Development (HUD) and the Detroit Housing Commission. Between 1996 and 2005, HUD invested approximately $44 million in the demolition of Herman Gardens and the construction of GVE. That funding came in the form of both Hope VI Revitalization Grants and Major Reconstruction of Obsolete Public Housing funds.

The City of Detroit also contributed approximately $13 million in 2006 towards infrastructure development at GVE, which included installation and improvement of roads, water and sewer lines, and utilities. The Detroit Building Authority was retained to oversee the infrastructure construction at GVE. In October 2006, the Detroit Housing Commission issued a request for proposals inviting bids from entities to serve as the construction manager of the GVE infrastructure project. In December 2006, HUD and the Detroit Housing Commission agreed to provide an additional $2 million for infrastructure construction at the GVE project. In January 2007, defendant Xcel Construction, Inc. signed a contract with the Detroit Building Authority to serve as construction manager for the infrastructure phase of the GVE project.

The government alleges that defendants Ferguson, Hall, Woodhouse, Ferguson Enterprises, Inc., and Xcel Construction Services, Inc. engaged in a conspiracy through which defendant Xcel Construction Services would ensure that the companies controlled by defendant Ferguson were awarded contracts to perform the work on the infrastructure of the GVE project. The government alleges that those defendants manipulated the bidding process and submitted fabricated bids to ensure that defendant Ferguson Enterprises was the low bidder on the infrastructure phase of the project and would be awarded a contract for $11.9 million, and that the companies that submitted

-3-

false bids were awarded subcontracts as compensation for their participation in the scheme. The government also states that between August 2008 and January 2009, the defendants submitted $1.5 million in change orders as part of the GVE project. The government alleges that the defendants committed mail fraud, laundered money, and structured financial transactions to avoid reporting obligations in executing the conspiracy. Between April 2007 and August 2010, the government alleges, the defendants conspired to dump soil and other refuse at the GVE site, requiring the federal government to spend more than $1.2 million to clean up the site.

The primary relevant factual dispute concerns the $2 million provided by HUD for infrastructure development. The defendants contend that no federal money was actually spent on the infrastructure phase of the GVE project (which was the only phase in which they were involved), and therefore there is no federal subject matter jurisdiction over the conspiracy and other related charges. The $2 million is referenced in a contract between the Detroit Housing Commission and the City of Detroit. The relevant contract language states:

> [Detroit Housing Commission] or HUD shall place the sum of $2,000,000 in an HUD LOCCS escrow account. That sum shall be used to cover the cost of change orders to the Infrastructure construction contracts caused by site conditions at the project site. The full amount of the City's financial contribution must be spent before the escrowed funds may be used for project cost. If the bids for the infrastructure construction work exceed the City's financial contribution to the project, the City and DHC may agree that the escrowed funds may be used for the increased costs.

Defs.' Mot. to Suppress Ex. 4 at 3. The contract also includes an exhibit that states that the total City funds available for the project were $13,726,544. The contract between the Detroit Building Authority and defendant Xcel Construction provided that Xcel would be paid $557,512.16 for acting as construction manager. The defendants have not furnished a copy of the contract awarded to defendant Ferguson Enterprises, nor do they state the amount of consideration stated in the contract.

-4-

However, the indictment alleges that defendant Ferguson Enterprises submitted a bid proposal in the amount of $11.9 million and that defendant Woodhouse recommended that it be awarded a contract in the amount of $12 million. The defendants assert that the full amount of the City of Detroit's financial contribution was not spent, and therefore the escrowed (federal) funds were never used.

The indictment was returned on September 1, 2010 and unsealed on September 8, 2010. After several time enlargements to accommodate the defendants' needs to review the voluminous discovery materials, five defense motions were filed in October 31, 2011. Defendant Hall filed a motion to sever his case for trial [dkt. #116] that was joined by defendants Ferguson and Ferguson Enterprises on November 2, 2011 [dkt. #129]. Defendants Woodhouse, Hall, and Xcel Construction services filed a motion for disclosure of the grand jury testimony of Brian Dodds and Marc Burrell [dkt. #117] that was joined by defendant Ferguson on October 31, 2011 [dkt. #120] and by defendant Ferguson Enterprises on November 2, 2011 [dkt. #128]. Defendants Woodhouse, Hall, and Xcel Construction Services filed a motion for disclosure of *Brady* materials pertaining to Brian Dodds, Marc Burrell, and Don Roberts [dkt. #118]. Defendants Woodhouse, Hall, and Xcel Construction Services filed a motion to sever their cases for trial [dkt. #119] that was joined by defendant Ferguson Enterprises on November 2, 2011 [dkt. #130]. Finally, defendants Ferguson and Ferguson Enterprises filed a motion to dismiss for lack of jurisdiction [dkt. #124]. The Court heard oral argument on the motions on December 22, 2011. They will be addressed in reverse order.

## II. Motion to dismiss

The gravamen of the defendants' motion to dismiss is that because no federal funds were spent on the infrastructure phase of the GVE project — the only phase in which the defendants were

involved — and none of the defendants' contracts were paid with federal funds, there is no federal interest to protect and no subject matter jurisdiction over the conduct charged in the indictment. The defendants contend that the crimes in counts I, III, IV, VI, and VIII of the indictment should be dismissed because there is insufficient evidence that the federal government was a victim of those crimes. The defendants highlight the growing concern about federalism reflected in the Supreme Court's decisions in *United States v. Lopez*, 514 U.S. 549 (1995), and *United States v. Morrison*, 529 U.S. 598, 617-19 (2000), so presumably their challenge to those counts takes root in Commerce Clause jurisprudence. In *Lopez*, the Court invalidated the defendant's conviction of possessing a firearm in a school zone in violation of the Gun-Free School Zones Act, finding that the statute exceeded Congress's Commerce Clause authority because possession of gun in local school zone was not economic activity that substantially affected interstate commerce. 514 U.S. at 561-62 (finding that the statute, which did not contain an element that ensured a case-by-case examination of a federal connection, "by its terms has nothing to do with 'commerce' or any sort of economic enterprise, however broadly one might define those terms. . . . It cannot . . . be sustained under our cases upholding regulations of activities that arise out of or are connected with a commercial transaction, which viewed in the aggregate, substantially affects interstate commerce"). Similarly, in *Morrison*, the Court declared unconstitutional the civil enforcement remedy in the Violence Against Women Act because it found no authority in the Commerce Clause for Congress to enact that law. 529 U.S. at 617-18 ("The Constitution requires a distinction between what is truly national and what is truly local. . . . The regulation and punishment of intrastate violence that is not directed at the instrumentalities, channels, or goods involved in interstate commerce has always been the province of the States.").

The defendants argue that counts II, V, and VII of the indictment should be dismissed because the connection to interstate commerce is insufficient to support federal jurisdiction.  The defendants, once again, quote extensively from *United States v. Lopez*.

The government bases its opposition to the motion primarily on the general premise that a motion to dismiss must be denied if it requires the district court to find facts that make up the elements of the case or determine the truth or falsity of facts in the indictment, which, perhaps, explains the government's anemic response to the substance of the defendants' arguments.  The government also points out that the indictment identifies $43.5 million in federal funds spent on the GVE project, with at least $2 million in HUD funds designated for the infrastructure portion of the project.  However, the defendants spend much effort on demonstrating through documentary evidence that none of the HUD funds were ever used to pay for infrastructure work.  The defendants have produced a Revitalization Plan submitted by the Detroit Housing Commission to HUD that states that the non-residential component of the plan will be funded with money from the City of Detroit and the Detroit Public Schools and that HUD funds would be used only for the residential components.

The government also demonstrates that the defendants' arguments that counts II, V, and VI of the indictment must be dismissed on the basis of *Lopez* have been uniformly rejected by the Sixth Circuit and by other circuits throughout the land.

Federal Rule of Criminal Procedure 12(b)(2) provides that "[a] party may raise by pretrial motion any defense, objection, or request that the court can determine without a trial of the general issue." Fed. R. Crim. P. 12(b)(2).  Citing *Universal Milk Bottle Serv., Inc. v. United States*, 188 F.2d 959, 962 (6th Cir. 1951), the government argues that the Rule prohibits adjudication of a pretrial

motion to dismiss when the Court must determine the truth or falsity of the indictment's factual allegations. However, "[d]istrict courts may ordinarily make preliminary findings of fact necessary to decide questions of law presented by pretrial motions so long as the trial court's conclusions do not invade the province of the ultimate factfinder." *United States v. Craft*, 105 F.3d 1123, 1126 (6th Cir. 1997); *see also United States v. Jones*, 542 F.2d 661, 665 (6th Cir. 1976) (holding that "[t]he District Court was not limited to the face of the indictment in ruling on the motion to dismiss. . . . Rule 12 vests the Court with authority 'to determine issues of fact in such manner as the court deems appropriate.'" (quoting Notes of the Advisory Committee to Fed. R. Crim. P. 12, reprinted in 8 Moore P 12.01(3) at 12-8)). "[A] claim that the indictment or information fails to invoke the court's jurisdiction" may be heard "at any time while the case is pending." Fed. R. Crim. P. 12(b)(3)(B).

### A.  Counts I, III, IV, VI, and VIII

Count I of the indictment charges defendants Ferguson, Woodhouse, Hall, Ferguson Enterprises, and Xcel Construction Services with conspiracy to defraud the United States in violation of 18 U.S.C. § 371.  That statute states, in relevant part:

> If two or more persons conspire either to commit any offense against the United States, or to defraud the United States, or any agency thereof in any manner or for any purpose, and one or more of such persons do any act to effect the object of the conspiracy, each shall be fined under this title or imprisoned not more than five years, or both.

18 U.S.C. § 371. "Conspiracy involves an agreement willfully formed between two or more persons to commit an offense, attended by an act of one or more of the conspirators to effect the object of the conspiracy." *United States v. Dolt*, 27 F.3d 235, 238 (6th Cir. 1994).  The government must also prove an intent to defraud, which can be demonstrated by proof of reckless disregard of the interests of a government agency. *United States v. Hoffman*, 918 F.2d 44, 46 (6th Cir. 1990); *United States*

-8-

*v. Luxenberg*, 374 F.2d 241, 249 (6th Cir. 1967). Further, it is well established that the meaning of fraud in that statute "is not confined to fraud as that term has been defined in the common law. It reaches any conspiracy for the purpose of impairing, obstructing or defeating the lawful function of any department of government." *Dennis v. United States*, 384 U.S. 855, 861 (1966) (internal quotation omitted). Success in defrauding the United States is not an element of this crime, nor is it required that the government actually have been "cheated out of money or property." *United States v. Thompson*, 366 F.2d 167, 171 (6th Cir. 1966).

The defendants argue that count I should be dismissed for lack of subject matter jurisdiction because the GVE infrastructure project was not federally funded. That theory views too narrowly the government's interest in the GVE project. The entire venture was funded with federal, state, and local money; the fact that the defendants were involved in a phase that may have been satisfied out of the local funding component is entirely beside the point.

There is no dispute that the GVE project as a whole was one that was substantially funded by HUD funds and that it was a joint project between HUD and the Detroit Housing Commission. Around $44 million in federal funds were contributed to the GVE project before infrastructure construction began. The attempt to separate the infrastructure construction funding from the overall joint HUD/Detroit Housing Commission venture ignores the reality of the federal government's interest in the GVE project, as well as the fact that the installation of infrastructure was essential to further the federal government's aim of creating residential housing at the site. The federal government therefore has an interest in seeing that the GVE project as a whole "was administered honestly, fairly and free from corruption, deceit, trickery, [and] dishonesty." *Thompson*, 366 F.2d

-9-

at 169.   That interest did not disappear abruptly when the project entered the infrastructure construction phase, only to reappear when the residential construction began.

Although not entirely analogous, the Sixth Circuit's decision in *Thompson* is instructive.   In that case, the federal government provided 52 percent of the construction costs of a hospital pursuant to the Hill-Burton Act, 42 U.S.C. § 291, and the county in which the hospital was to be located contributed 48 percent of the costs.   The architects hired to construct the hospital paid a $6,000 kickback to the defendants, who were members of the county council.   The defendants were found guilty of conspiracy to defraud the United States and appealed, challenging the district court's denial of their motions to dismiss and for a judgment of acquittal.   The defendants argued that the kickback money did not come from federal funds and that the architectural fees were paid by the county, rather than out of federal funds.   The court found that although there was evidence in the record that could support a finding that the architectural fees had been paid with federal funds, "it was not necessary . . . for the Government to prove that part of the architect fee was reimbursed with federal funds. . . . The administration of this Hill-Burton project . . . included a dishonest influence in the form of a kickback.   This constituted a crime within the scope of the statute under the facts of this case."   *Id*. at 173.

In this case, the question whether the defendants actually received payment from federal funds is likewise irrelevant in determining whether the Court has subject matter jurisdiction, as the federal government's interest in seeing that a project it has funded is administered honestly and fairly is sufficient to confer jurisdiction.

The defendants' argument that the increased concern for federalism embodied in *Lopez* mandates a stronger federal connection than that described in *Thompson* to confer jurisdiction on

-10-

this Court does not carry much weight for several reasons. First, the authority on which they rely has been undermined. They analogize the charge in count I to crimes charged under 18 U.S.C. § 666, which proscribes bribery of local, state, and tribal officials where the local governments receive at least $10,000 in federal funds, and cite three cases suggesting that some nexus beyond the receipt of federal money is necessary to charge defendants under the statute. However, two of the three cases cited by the defendants in support of that argument were abrogated expressly by the Supreme Court on this point in *Sabri v. United States*, 541 U.S. 600, 604 (2004). In *United States v. Zwick*, 199 F.3d 672 (3d Cir. 1999), one of the defendants' cases, the Third Circuit held that 18 U.S.C. § 666 required a connection between the federal funds and the defendant's conduct in order to create liability, but stated that a "highly attenuated implication of a federal interest" would be sufficient. *Id.* at 687. As examples of such attenuated federal interests, the court mentioned federal funds being used to house federal prisoners in local prisons, and bribing an official of a town that received the majority of its budget from federal funding. *Ibid.* Similarly, in *United States v. Santopietro*, 166 F.3d 88 (2d Cir. 1999), the Second Circuit held that 18 U.S.C. § 666 required "at least some connection between the bribe and a risk to the integrity of the federally funded program." *Id.* at 93. In that case, the court reasoned that the government should not be allowed "to use section 666(a)(1)(B) to prosecute a bribe paid to a city's meat inspector in connection with a substantial transaction just because the city's parks department had received a federal grant of $10,000." *Ibid.*

However, in *Sabri*, the Supreme Court held that 18 U.S.C. § 666 did not require a nexus between a defendant's conduct and federal funds, and that the statute was constitutional even in the face of the enhanced federalism concerns embodied in *Lopez* and *Morrison*. *Sabri*, 541 U.S. at 605-08. One main reason is that where federal funds are involved, the constitutional authority to punish

-11-

mischief in expropriating the money derives not from the Commerce Clause but from the Spending Clause. *Id.* at 605 ("Congress has authority under the Spending Clause to appropriate federal moneys to promote the general welfare, Art. I, § 8, cl. 1, and it has corresponding authority under the Necessary and Proper Clause, Art. I, § 8, cl. 18, to see to it that taxpayer dollars appropriated under that power are in fact spent for the general welfare, and not frittered away in graft or on projects undermined when funds are siphoned off or corrupt public officers are derelict about demanding value for dollars."). And this authority to protect the fisc extends to local projects on a project-wide basis. So when considering whether the government must prove a connection between federal funds and the defendant's bribery, the Court explained:

> It is true, just as [the defendant] says, that not every bribe or kickback offered or paid to agents of governments covered by § 666(b) will be traceably skimmed from specific federal payments, or show up in the guise of a *quid pro quo* for some dereliction in spending a federal grant. Cf. *Salinas v. United States,* 522 U.S. 52, 56-57 (1997) (The "expansive, unqualified" language of the statute "does not support the interpretation that federal funds must be affected to violate § 666(a)(1)(B)"). But this possibility portends no enforcement beyond the scope of federal interest, for the reason that corruption does not have to be that limited to affect the federal interest. Money is fungible, bribed officials are untrustworthy stewards of federal funds, and *corrupt contractors do not deliver dollar-for-dollar value. Liquidity is not a financial term for nothing; money can be drained off here because a federal grant is pouring in there.*

*Id.* at 605-06 (emphasis added).

The same reasoning applies to the crime of conspiracy to defraud the government under 18 U.S.C. § 371. Whether federal funds were provided to support infrastructure construction in particular is irrelevant where the project as a whole was largely federally funded and city money could be drained off by an allegedly corrupt contractor on the infrastructure project because federal grants were pouring in on other parts of the project. *Salinas v. United States*, 522 U.S. 52 (1997), likewise supports that reasoning. There, the Supreme Court held that the government need not show

-12-

that federal funds were actually used or involved in a specific bribery transaction under 18 U.S.C. § 666. *Id.* at 56-57. Similarly, the government need not show that federal funds were actually used or involved in the specific contract won by bid-fixing in this case to prove a violation of 18 U.S.C. § 371; nor must the government show a nexus between the defendants' conduct and federal funds to prove a federal crime.

Second, the defendants' Commerce Clause argument mises the mark. The Supreme Court has held that the increased federalism concerns expressed in *Lopez* and *Morrison* did not affect the constitutionality of 18 U.S.C. § 666. The Court found that those precedents did not control, because the question of an insufficient connection to commerce was irrelevant where the statute was meant to control corruption affecting federal spending. *Sabri*, 541 U.S. at 607-08. The Court stated that "Congress was within its prerogative to protect spending objects from the menace of local administrators on the take. The power to keep a watchful eye on expenditures and on the reliability of those who use public money is bound up with congressional authority to spend in the first place, and [the defendant] would be hard pressed to claim, in the words of the *Lopez* Court, that § 666(a)(2) 'has nothing to do with' the congressional spending power." *Id.* at 609 (quoting *Lopez*, 514 U.S. at 561). In this case, the federal authority to prosecute the defendants is based on Congress's power to spend and to protect the objects of its spending from corruption.

Third, the defendants' citation to *Fischer v. United States*, 529 U.S. 667 (2000), in an effort to isolate the infrastructure component of the project, is unavailing. In that case, the issue the Court was decided was whether Medicare payments to a hospital constituted "benefits" within the meaning of 18 U.S.C. § 666. *Fischer*, 529 U.S. at 671. The Court found that the payments at issue in that case constituted benefits because they were intended to ensure the availability of quality medical

care and required compliance with a host of Medicare regulations. *Id.* at 679-80. The language cited by the defendants, to the effect that not every expenditure of federal funds through an assistance program constitutes a benefit, comes in the context of that discussion. *See id.* at 682. However, there is no similar question of the definition of benefits in this case, as 18 U.S.C. § 371 does not mention "benefits," and instead criminalizes a conspiracy to defraud the United States. Further, the Court explained:

> To determine whether an organization participating in a federal assistance program receives "benefits," an examination must be undertaken of the program's structure, operation, and purpose. The inquiry should examine the conditions under which the organization receives the federal payments. The answer could depend, as it does here, on whether the recipient's own operations are one of the reasons for maintaining the program. . . . The Government has a legitimate and significant interest in prohibiting financial fraud or acts of bribery being perpetrated upon Medicare providers.

*Id.* at 681. Thus, the Court's analysis here — even if inapplicable under the defendants' gloss on it — actually suggests that federal jurisdiction is proper. The government has a significant interest in prohibiting fraud being perpetrated in connection with a project that was largely federally funded. The defendants' motion to dismiss count I of the indictment for want of federal jurisdiction, therefore, must be denied.

The motion to dismiss count III suffers the same fate. Count III charges defendants Ferguson, Woodhouse, Hall, and Xcel Construction Services with conspiracy to launder monetary instruments in violation of 18 U.S.C. §§ 1956(a)(1)(B)(i) and 1956(h). That statute states, in relevant part, that "[w]hoever, knowing that the property involved in a financial transaction represents the proceeds of some form of unlawful activity, conducts or attempts to conduct such a financial transaction which in fact involves the proceeds of specified unlawful activity — . . . knowing that the transaction is designed in whole or in part — to conceal the nature, location, the

-14-

source, the ownership, or the control of the proceeds of specified unlawful activity . . . shall be sentenced" as specified in the statute.  18 U.S.C. § 1956(a)(1)(B)(i).  In this case, the specified unlawful activity alleged by the government was mail fraud in violation of 18 U.S.C. § 1341.  Mail fraud constitutes a "specified illegal activity" as defined in 18 U.S.C. § 1956(c)(7)(A).  *See* 18 U.S.C. § 1956(c)(7)(A) ("As used in this section – . . . the term 'specified unlawful activity' means – (A) any act or activity constituting an offense listed in section 1961(1) of this title except an act which is indictable under subchapter II of chapter 53 of title 31 . . . ."); 18 U.S.C. § 1961(1) (listing "section 1341 (relating to mail fraud)" as an act constituting racketeering activity).  The defendants do not make a specific argument as to why the Court lacks subject matter jurisdiction over this count of the indictment.  However, the Sixth Circuit has held, post-*Lopez*, that "the use of federally insured banks . . . create[s] a sufficient nexus to interstate commerce to allow application of § 1956. . . . This connection alone is enough to place § 1956 into *Lopez*'s second category, *i.e.*, into the range of statutes governing 'the instrumentalities of interstate commerce . . . even though the threat may come only from intrastate activities.'"  *United States v. Owens*, 159 F.3d 221, 226 (6th Cir. 1998) (quoting *Lopez*, 514 U.S. at 559).  The grand jury alleged in the indictment that the defendants used First Independence Bank in their money-laundering scheme, and First Independence Bank is a member of the Federal Deposit Insurance Corporation.  Indictment at 17; First Independence Bank, http://www.firstindependence.com (last visited Feb. 15, 2012).  Under Sixth Circuit law, that is sufficient to confer jurisdiction on this Court.

Count IV of the indictment charges defendants Ferguson, Woodhouse, Ferguson Enterprises, Inc., and Xcel Construction Services with conspiracy to willfully injure property of the United States in violation of 18 U.S.C. § 1361.  That statute provides criminal liability for anyone who "willfully

injures or commits any depredation against any property of the United States, or of any department or agency thereof, or any property which has been or is being manufactured or constructed for the United States. . . ." 18 U.S.C. § 1361. The government alleges that the charged defendants dumped soil, debris, and excavated material at the GVE site and that HUD and the DHC have been required to pay more than $1.2 million for the removal of those materials and the environmental remediation made necessary by those materials. Indictment at 20. The defendants do not challenge the government's allegation that the GVE project's residential component was federally funded, and thus the housing at the GVE site was being constructed for the United States. Nor do they specifically challenge the assertion that federal money was spent to clean up materials dumped at the GVE site. Therefore, even if the Court accepted the defendants' premise that the infrastructure portion of the project can be isolated for funding purposes, which it does not, the defendants' motion to dismiss count IV on jurisdiction grounds must be denied.

In count VI, defendants Ferguson and Deria are charged with conspiracy to obstruct justice under 18 U.S.C. § 1503. The indictment charges that the defendants conspired to have defendant Deria provide false statements to federal law enforcement agents conducting an investigation on behalf of a federal grand jury. This Court plainly has subject matter jurisdiction over such a claim, and the defendants do not provide any specific argument to the contrary. Similarly, in count VIII of the indictment, defendants Ferguson, Deria, Ferguson Enterprises, and A&F Environmental/Johnson Construction Services are charged with conspiracy to structure financial transactions to evade federal reporting requirements under 31 U.S.C. § 5324. The defendants have not provided any specific argument that would justify dismissal of that count on any basis. Therefore, the defendants' motion to dismiss counts VI and VIII of the indictment will be denied.

B.  Counts II, V, and VII

The defendants challenge count II of the indictment, in which defendants Ferguson, Woodhouse, Hall, Ferguson Enterprises, and Xcel Construction Services are charged with conspiracy to commit mail fraud under 18 U.S.C. §§ 1341 and 1349, and counts V and VII, in which defendant Ferguson is charged with being a felon in possession of a firearm under 31 U.S.C. § 5324, by arguing that the mail fraud and felon in possession statutes exceed Congress's power under the Commerce Clause. The defendants rely on arguments that, as they acknowledge, have been rejected by the Fourth and Sixth Circuits. The Sixth Circuit repeatedly has rejected the argument that the felon in possession statute exceeds Congress's powers under the Commerce Clause. *See United States v. Henry*, 429 F.3d 603, 619-20 (6th Cir. 2005) (noting that the Sixth Circuit has "explicitly held post-*Lopez* that a § 922(g)(1) conviction comports with the Commerce Clause so long as the defendant possessed a gun that previously had moved in interstate commerce" (internal quotation omitted)); *United States v. Chesney*, 86 F.3d 564, 572 (6th Cir. 1996). That argument also has been rejected by every other circuit to address the issue. *See Henry*, 429 F.3d at 620 (citing cases).

Although the Sixth Circuit has not yet addressed the question of the constitutionality of the mail fraud statute, the constitutionality of that statute has been upheld by every circuit to consider the matter post-*Lopez. See United States v. Gil*, 297 F.3d 93, 100 (2d Cir. 2002) (upholding the constitutionality of the mail fraud statute even where the mailings at issue are intrastate); *United States v. Photogrammetric Data Servs., Inc.*, 259 F.3d 229, 249-52 (4th Cir. 2001), *abrogated with respect to other principles by Crawford v. Washington*, 541 U.S. 36 (2004); *United States v. Brumley*, 116 F.3d 728, 730 (5th Cir. 1997); *United States v. Elliott*, 89 F.3d 1360, 1363-64 (8th Cir.

-17-

1996) (finding the statute constitutional under the Postal Power).  Further, the Sixth Circuit has upheld the constitutionality of a federal statute criminalizing using fire or explosives to commit a federal offense against a Commerce Clause challenge in a case where the underlying offense was mail fraud.  *United States v. McAuliffe*, 490 F.3d 526, 536 (6th Cir. 2007).  Finally, in *United States v. Lopez*, 514 U.S. 549, 558 (1995), the Supreme Court held that Congress has the power "to regulate and protect the instrumentalities of interstate commerce . . . even though the threat may come from only intrastate activities."  *Ibid.*  This Court finds that reasoning persuasive and adopts it as its own, and holds that the mail fraud statute is constitutional under the Commerce Clause as a regulation of an instrumentality of interstate commerce.

The motion to dismiss the indictment for want of jurisdiction will be denied.

### III.  Motions to sever

Defendant Calvin L. Hall argues that severance of his case for trial is required under Federal Rule of Criminal Procedure 14 because he would be prejudiced by the joinder of his trial with that of the other defendants.  He states that the risk of prejudice inherent in a joint conspiracy trial is accentuated here where the co-defendants are charged in three additional conspiracies and two additional substantive offenses and where evidence will be admitted that would be inadmissible in a separate trial, although he does not identify that evidence with any specificity.  He does anticipate generally, however, that the evidence of the conspiracies in which he was not involved will overshadow the evidence presented against him.  He also argues that a separate trial should be allowed on the grounds of misjoinder because multiple defendants have been charged with offenses arising out of different transactions.

Defendants Michael Woodhouse and Xcel Construction Services argue that their cases should be severed for trial and observe that under Federal Rule of Criminal Procedure 14, a district court should grant a motion for severance if there is a serious risk that a joint trial will compromise the rights of a defendant, prevent the jury from making a reliable determination as to guilt, or involve complex issues and differing degrees of culpability among the defendants. They note that the Sixth Circuit has found severance proper where it is necessary to safeguard the right to a fair trial or where inflammatory evidence will be presented against some but not all of the defendants. *See United States v. Wirsing*, 719 F.2d 859, 863 (6th Cir. 1983); *United States v. Breining*, 70 F.3d 850, 853 (6th Cir. 1995). Woodhouse and Xcel believe that the government has a great deal of evidence against the other defendants in the case, but that much of that evidence is not applicable to them. They also say that if the motion to sever is not granted, their entire trial strategy will have to change and defense counsel will have to spend "a considerable amount of time and energy" distinguishing defendant Woodhouse from his co-defendants.

The government cites the preference in the federal system for joint trials when defendants are indicted together, and argues that the defendants have not shown that a joint trial would cause them "specific and compelling prejudice," which they must show. *See United States v. Harris*, 9 F.3d 493, 500 (6th Cir. 1993). The government asserts that defendant Hall is a central member of the conspiracies charged in the first three counts of the indictment and that much of the evidence presented at trial on these counts will concern his actions. The government further asserts that defendant Woodhouse only offers vague and conclusory allegations of inflammatory evidence and complex conspiracies that fail to meet the burden of demonstrating prejudice. Finally, the government points out — accurately — that defendants Bobby Ferguson and Ferguson Enterprises

-19-

filed notices of joinder in the severance motions, but offered no factual or legal arguments in support of their notices.

As an initial matter, there is no improper joinder here.  Under Federal Rule of Criminal Procedure 8(a), indictments may charge defendants with more than one offense "if the offenses charged . . . are of the same or similar character, or are based on the same act or transaction, or are connected with or constitute parts of a common scheme or plan."  Fed. R. Crim. P. 8(a).  Rule 8(b) states that an "indictment . . . may charge 2 or more defendants if they are alleged to have participated in the same act or transaction, or in the same series of acts or transactions, constituting an offense or offenses.  The defendants may be charged in one or more counts together or separately."  Fed. R. Crim. P. 8(b).  Rule 8(b) "can, and should, be broadly construed in favor of initial joinder, because of the protection Rule 14 offers against unnecessarily prejudicial joinder." *United States v. Swift*, 809 F.2d 320, 322 (6th Cir. 1987) (internal quotations omitted).

Defendant Hall argues that the cases are joined improperly because the indictment charges multiple defendants with different offenses arising out of separate transactions, and other defendants are charged with unrelated offenses.  The government does not address that argument in its response, but Hall does not elaborate on the argument beyond an assertion that the indictment does not allege that each defendant participated in the same transaction or series of transactions.  However, "[a]ll defendants need not be charged in each count."  Fed. R. Crim. P. 8(b).  Further, "[i]n the decision of whether to join, the predominant consideration is whether joinder would serve the goals of trial economy and convenience; the primary purpose of this kind of joinder is to insure that a given transaction only be proved once."  *Swift*, 809 F.2d at 322 (internal quotation omitted).  The Sixth

-20-

Circuit has held that a group of acts or transactions constitutes a series if they "are logically interrelated and involve overlapping proof." *Ibid.*

A casual reading of the indictment demonstrates that all of the charges arise out of the defendants' alleged misconduct in connection with the Garden View Estates project and their attempts to disguise money flowing to the various defendants as a result of that misconduct. Those charges may be joined together. *See United States v. Bibby*, 752 F.2d 1116, 1121 (6th Cir. 1985) ("[C]oncealment of ill-gotten gain is an integral part of assuring the success of that illegal activity."). The only charges that arguably are not connected to that underlying criminal scheme are the felon in possession charges against defendant Ferguson and obstruction of justice charges against defendants Ferguson and Deria. However, the firearms were presumably found in a search that resulted from the investigation of the misconduct surrounding the GVE project, and the obstruction of justice charges are based on misleading information provided by defendant Deria in connection with one of the firearms. Joining those charges are in the interests of trial economy, as it appears that both the guns were found when other evidence was seized. *See United States v. Hang Le-Thy Tran*, 433 F.3d 472, 478 (6th Cir. 2006) (finding that the fact that witnesses for two offenses would overlap supported joinder).

Rule 14(a) states that "[i]f the joinder of offenses or defendants in an indictment . . . or a consolidation for trial appears to prejudice a defendant or the government, the court may order separate trials of counts, sever the defendants' trials, or provide any other relief that justice requires." Fed. R. Crim. P. 14(a). But in the federal system, there is a preference for joint trials of defendants who are indicted together. *Zafiro v. United States*, 506 U.S. 534, 537 (1993). Joint trials "promote efficiency and 'serve the interests of justice by avoiding the scandal and inequity of

-21-

inconsistent verdicts.'" *Ibid*. (quoting *Richardson v. Marsh*, 481 U.S. 200, 210 (1987)). The preference for joint trials is especially strong where "two defendants are accused of participating in a conspiracy or joint scheme." *United States v. Cope*, 312 F.3d 757, 780 (6th Cir. 2002). The Supreme Court has held that "when defendants properly have been joined under Rule 8(b), a district court should grant a severance under Rule 14 only if there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence." *Zafiro*, 506 U.S. at 539. A risk of prejudice might occur where "evidence that the jury should not consider against a defendant and that would not be admissible if a defendant were tried alone is admitted against a codefendant." *Ibid*. But the defendants have cited no such evidence here.

It is true that the risk of prejudice is heightened where "defendants are tried together in a complex case and they have markedly different degrees of culpability." *Ibid*. (citing *Kotteakos v. United States*, 328 U.S. 750, 774-75 (1946)). However, "less drastic measures, such as limiting instructions, often will suffice to cure any risk of prejudice." *Ibid*. (citing *Richardson*, 481 U.S. at 211). "Juries are presumed to be capable of following instructions . . . regarding the sorting of evidence and the separate consideration of multiple defendants." *United States v. Walls*, 293 F.3d 959, 966 (6th Cir. 2002) (citations omitted). Therefore, in order to prevail on a motion to sever, a defendant must show "compelling, specific, and actual prejudice" resulting from a joint trial. *United States v. Driver*, 535 F.3d 424, 427 (6th Cir. 2008) (citation omitted). Moreover, "[d]efendants are not entitled to severance merely because they may have a better chance of acquittal in separate trials." *United States v. Long*, 190 F.3d 471, 476 (6th Cir. 1999) (citing *Zafiro*, 506 U.S. at 540). Nor is severance required "if some evidence is admissible against some defendants and not others"

-22-

or "because the proof is greater against a co-defendant." *United States v. Warner*, 971 F.2d 1189, 1196 (6th Cir. 1992).

Defendants Woodhouse and Hall argue that their trials should be severed on the grounds of undue prejudice, but neither has met his burden of showing specific and compelling prejudice that would result from a joint trial. In support of their motions, the defendants state that the evidence that will be presented in the case is complex and that some of it will not apply to them. No doubt. That often happens in conspiracy cases in which the government has alleged misconduct on the part of persons accused of playing different roles involving varying levels of culpability. However, neither defendant has pointed to any specific item of evidence that would be prejudicial to him if introduced. Instead, the defendants allege in a conclusory fashion that a majority of evidence presented in the case will not be applicable to them, and thus that the jury will not be able to compartmentalize the evidence even with the aid of a limiting instruction. But such generalities are not enough to demonstrate the requisite level of prejudice. Moreover, even if the defendants' characterization of the evidence to be presented at trial is correct, the Sixth Circuit has held that the fact that a majority of evidence offered at trial does not implicate a co-defendant does not, without more, justify severance. *Warner*, 971 F.2d at 1196.

Nor has either defendant pointed to a specific trial right that would be abridged, beyond generally stating that a joint trial would compromise his right to a fair trial. Defendant Woodhouse states that being tried along with his co-defendants would require an alteration of his trial strategy to differentiate him from his co-defendants, but he does not state that his current strategy requires admission of evidence that would be inadmissible in a joint trial. *See Zafiro*, 506 U.S. at 539. A need to employ a trial strategy of differentiating a defendant from his co-defendants cannot be

-23-

sufficient to demonstrate prejudice requiring severance; if it were, it would be virtually impossible to try co-defendants, whose levels of culpability differ, together in a single trial. Because the defendants have not made a "strong showing of factually specific and compelling prejudice resulting from a joint trial," *Warner*, 971 F.2d at 1196, their motions to sever must be denied.

## IV. Motions for discovery

The defendants have moved for disclosure of the grand jury testimony of Brian Dodds and "Marc Burrell," who created fraudulent bid forms for the GVE project. The defendants also seek information that they characterize as *Brady* material, consisting of any information indicating that Brian Dodds, Marc Burrell, or Don Roberts faced pressure to or received a reward for agreeing to testify unfavorably about the defendants and information that could tend to impeach the witnesses, including inconsistent statements and grants of immunity. The defendants believe that the government has offered the named individuals immunity or leniency in exchange for their testimony, and state that they are aware that Donald Roberts has a use immunity agreement and Brian Dodds has entered into a plea agreement.

The government asserts that there is no witness in the case named "Marc Burrell," although there is one identified as Rodney Burrell. The government assumes, as does the Court, that the defendants meant to ask for materials that relate to him. That said, the government erects the Jencks Act, 18 U.S.C. § 3500(a), as a barrier to the production of the grand jury testimony sought. The government also contends that the defendants have not met their burden of demonstrating the materiality of the information they seek under *Brady*, and also asserts that it already has produced copies of Donald Roberts' immunity agreement and Brian Dodds's and Rodney Burrell's plea agreements. It maintains that it does not intend to call Donald Roberts as a witness in its case in

-24-

chief.  The government also argues that it has furnished all relevant materials subject to disclosure, including voluminous materials that have exceeded the government's discovery obligations under Rule 16 and *Brady*.  And it insists that all potential impeachment materials have either been turned over, are set forth in publically available documents, or are Jencks Act materials.

The government's argument that the Jencks Act bars pretrial production of the grand jury testimony of a potential trial witness is not supported by the law in this circuit.  The Sixth Circuit has held that "the general prohibition in [the Jencks Act] against requiring disclosure of statements of witnesses until after they have testified does not apply to grand jury testimony."  *United States v. Short*, 671 F.2d 178, 186 (6th Cir. 1982).  In reaching that conclusion, the *Short* court considered the legislative history of the 1970 amendment to the Jencks Act, which led to the Act's present language.  The amendment was enacted after the Supreme Court construed the Act in *Pittsburgh Plate Glass Co. v. United States*, 360 U.S. 395 (1959), as having no application to grand jury transcripts.  *Short*, 671 F.2d at 185.  Congress then amended the Act to include grand jury testimony in the Act's definition of "statement."  *Ibid.*  However, the Act only defines the term "statement" as used in subsections (b), (c), and (d) of the Act.  *See* 18 U.S.C. § 3500(e) ("The term 'statement', as used in subsections (b), (c), and (d) of this section . . . means – . . . (3) a statement, however taken or recorded, or a transcription thereof, if any, made by said witness to a grand jury.").  That definition explicitly excludes subsection (a), which "refers to statements or reports in possession of the prosecution made by a government witness or prospective government witness," and governs pre-trial discovery.  *Short*, 671 F.2d at 185-86.  By contrast, subsections (b), (c), and (d) of the Jencks Act refer to statements of witnesses who have actually testified at trial.  The Sixth Circuit reasoned, therefore:

> The 1970 amendment by its terms made the definition of "statement" include grand jury testimony only when sought after a witness has testified at trial. The 1970 amendment did not affect a trial court's discretion to order pretrial discovery of grand jury testimony. . . . The amendment merely made clear that after a government witness has testified, that witness's grand jury testimony, if any, is included among the "statements" which the defendant is entitled to have produced. The Jencks Act does not apply to a motion for pretrial disclosure of a grand jury transcript. Such a motion is covered by [Federal Rule of Criminal Procedure] 6(e).

*Ibid*. (internal citations omitted). Therefore, the Court must analyze the defendants' request for transcripts of the grand jury testimony of Dodds and Burrell under the Federal Rules of Criminal Procedure 6(e).

Rule 6(e) allows a court to "authorize disclosure — at a time, in a manner, and subject to any other conditions that it directs — of a grand-jury matter preliminarily to or in connection with a judicial proceeding." Fed. R. Crim. P. 6(e)(3)(E)(I). The Supreme Court has recognized that "the proper functioning of our grand jury system depends upon the secrecy of grand jury proceedings," but that "in some situations justice may demand that discrete portions of transcripts be made available for use in subsequent proceedings." *Douglas Oil Co. of California v. Petrol Stops Northwest*, 441 U.S. 211, 218-20 (1979). "Parties seeking grand jury transcripts under Rule 6(e) must show that the material they seek is needed to avoid a possible injustice in another judicial proceeding, that the need for disclosure is greater than the need for continued secrecy, and that their request is structured to cover only material so needed." *Douglas Oil Co. of California*, 441 U.S. at 222. "[T]he secrecy of grand jury proceedings may be lifted only to the extent necessary to fulfill a narrowly tailored and compelling need." *In re Grand Jury 89-4-72*, 932 F.2d 481, 489 (6th Cir. 1991).

It is well established that a defendant seeking pretrial disclosure of grand jury testimony under Rule 6(e) must demonstrate a "particularized need" for the material. *United States v. Azad*,

-26-

809 F.2d 291, 295 (6th Cir. 1986); *see also United States v. Rutherford*, 509 F.3d 791, 795 (6th Cir. 2007) (citing *Federal Deposit Ins. Corp. v. Ernst & Whinney*, 921 F.2d 83, 86-87 (6th Cir. 1990)). "A general claim . . . that disclosure of grand jury transcripts would reveal exculpatory evidence is not sufficient to satisfy the requirement of a showing of particularized need." *Short*, 671 F.2d at 187. "Where a particularized need for disclosure has been demonstrated, a district court that is properly seized of the question is given wide discretion to decide whether it is the need for secrecy that predominates, or the need for disclosure." *In re Grand Jury Proceedings*, 841 F.2d 1264, 1268-69 (6th Cir. 1988). This need for secrecy is reduced when a grand jury's functions are ended; in that case, "disclosure is wholly proper where the ends of justice require it." *United States v. Socony-Vacuum Oil Co.*, 310 U.S. 150, 234 (1940).

The defendants' description of their particularized need is quite weak. It goes something like this: the testimony of Brian Dodds and [Rodney] Burrell likely will be important at trial, and therefore the defendants need their grand jury testimony to prepare for trial effectively. The defendants arguably have identified a need, but it is hardly particularized. In fact, it is difficult to imagine what need could be more general than a need to prepare for trial. However, the defendants also state that they believe that Dodds and Burrell may have embellished testimony or made inconsistent statements before the grand jury. A need for impeachment evidence has been found to be a particularized need sufficient to justify disclosure of grand jury transcripts, especially where the witnesses concerned are important to the government's case. *See Dennis v. United States*, 384 U.S. 855, 869-70 (1966). In *Dennis*, however, the motion for disclosure was made after the witnesses testified at trial, there was a gap of seven years between the grand jury testimony and the trial, the witnesses' testimony was largely uncorroborated, and one witness admitted that he had

been mistaken about key dates. *Id.* at 872-73. In this case, the defendants have offered no specific reason to believe that Dodds or Burrell may have fabricated their testimony, nor any specific reason to think that their testimony will be unreliable. Moreover, the grand jury testimony will be available for the defendants under the Jencks Act, which the government intends to relax when it produces the testimony three weeks before trial.

The defendants' general statements that they need the grand jury testimony to prepare for trial and for possible impeachment of the witnesses are insufficient to demonstrate a particularized need for disclosure of grand jury testimony.

It is not clear that the other witness material falls within the rule of *Brady v. Maryland,* 373 U.S. 83 (1963). But the defendants are entitled to production where "[t]he evidence at issue [is] favorable to the accused, either because it is exculpatory, or because it is impeaching . . . ." *Strickler v. Greene,* 527 U.S. 263, 281-82 (1999). The defendants must demonstrate that the information is material, but "the issue of materiality for *Brady* purposes pertains only to the question of a defendant's guilt or innocence, not to the issue of a defendant's ability or inability to prepare for trial." *United States v. Phillips*, 948 F.2d 241, 249 (6th Cir. 1991) (citing *United States v. Agurs*, 427 U.S. 97, 112 n. 20 (1976)). "Impeachment evidence . . . , as well as exculpatory evidence, falls within the *Brady* rule." *United States v. Bagley,* 473 U.S. 667, 676 (1985). However, "[t]he *Brady* doctrine did not create a constitutional right of pre-trial discovery in criminal cases." *United States v. Presser*, 844 F.2d 1275, 1284 (6th Cir. 1988). The constitutional right "to question adverse witnesses . . . does not include the power to require the pretrial disclosure of any and all information that might be useful in contradicting unfavorable testimony." *Pennsylvania v. Ritchie,* 480 U.S. 39, 53 (1987) (plurality opinion).

*Brady*, of course, is a constitutional rule, and the Jencks Act cannot trump it. The issue that arises when the government interposes the Jencks Act to resist pretrial discovery, as here, even of exculpatory or impeaching material, is one of timing. "The clear and consistent rule of [the Sixth] circuit is that the intent of Congress expressed in the Act must be adhered to and, thus, the government may not be compelled to disclose Jencks Act material before trial." *Presser*, 844 F.2d at 1283 (citing *United States v. Algie*, 667 F.2d 569, 571 (6th Cir. 1982); *United States v. Carter*, 621 F.2d 238, 240 (6th Cir. 1980)). The Sixth Circuit has held that material that is arguably exculpatory under *Brady* and yet arguably protected by the Jencks Act must be "disclosed in time for its 'effective' use at trial." *Presser*, 844 F.2d at 1283. Further, Federal Rule of Criminal Procedure 16(a)(2) states that the rule governing disclosure in criminal cases does not "authorize the discovery or inspection of statements made by prospective government witnesses except as provided in 18 U.S.C. § 3500." Fed. R. Crim. P. 16(a)(2).

The defendants' request for any materials that may tend to impeach Brian Dodds, Rodney Burrell, and Donald Roberts, as well as the substance and subject matter of all discussions between those individuals and the government, must be viewed in that context. The government states that all of that material either has been disclosed to the defendants already, is publicly available, or is Jencks Act material and is thus not subject to pretrial disclosure. The government promises that it will provide all Jencks Act material that is also potentially *Brady* material to the defendants three weeks before trial in accordance with *Presser*. The defendants have not suggested any reason to believe that the government is withholding *Brady* material to which the defendants are entitled, beyond the somewhat enigmatic statement that "[d]efense counsel has reason to believe that the prosecution offered" the above-named potential witnesses "some sort of immunity or lenient

sentence in exchange for their testimony against the Defendants." Def.'s Mot. for Disclosure of Brady Materials at 6. Nor do the defendants specify what they wish to obtain in discovery, beyond the substance of conversations between these individuals and the government.

The Court does not have the authority to order the disclosure of the substance of conversations between potential witnesses and the government under Federal Rule of Criminal Procedure 16(a)(2) or the Jencks Act. Nor do the defendants' requests fall under any other discovery provision contained in Rule 16. The defendants are entitled to pretrial disclosure of plea agreements and immunity promises for those witnesses, but the government has represented that it has furnished that material already. The Court will deny the defendants' motion to produce the other items, although without prejudice to a subsequent showing if new information comes to light.

### V. Conclusion

The Court has subject matter jurisdiction over all counts of the indictment. There is no misjoinder of counts, and the defendants have not demonstrated the prejudice necessary to justify severance. The defendants have not shown a particularized need for the grand jury testimony of Brian Dodds or Rodney Burrell at this time, and they have not identified any *Brady* material that has not been produced.

Accordingly, it is **ORDERED** that the motion to dismiss the indictment for want of subject matter jurisdiction [dkt. #124] is **DENIED**.

It is further **ORDERED** that the motions to sever by defendants Hall, Woodhouse, and Xcel Construction Services [dkt. #116, 119] are **DENIED**.

It is further **ORDERED** that the motions for disclosure of grand jury and *Brady* materials [dkt. #117, 118] are **DENIED WITHOUT PREJUDICE**.

s/David M. Lawson
DAVID M. LAWSON
United States District Judge

Dated:  February 16, 2012

**PROOF OF SERVICE**

The undersigned certifies that a copy of the foregoing order was served upon each attorney or party of record herein by electronic means or first class U.S. mail on February 16, 2012.

s/Deborah R. Tofil
DEBORAH R. TOFIL