UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

                                Case No. 10-20535

            Plaintiff,               Honorable David M. Lawson

v.

BOBBY W. FERGUSON, MICHAEL
WOODHOUSE, CALVIN L. HALL,
FERGUSON ENTERPRISES, INC.,
XCEL CONSTRUCTION SERVICES,
INC., and A & F ENVIRONMENTAL/
JOHNSON CONSTRUCTION SERVICES,

               Defendants.
_____/

**OPINION AND ORDER DENYING DEFENDANTS' JOINT MOTION
TO STRIKE THE VENIRE DUE TO AN
UNDERREPRESENTATION OF AFRICAN-AMERICANS**

Trial commenced in this case on May 8, 2012 when 116 prospective jurors were summoned

from the Qualified Jury Wheel in the Detroit division of this district. Jury selection was protracted

because of pretrial publicity that has exposed exactly one-half of the jury venire to information about

the case, some of the defendants, the witnesses, or the attorneys. Midway through the jury selection

process, the defendants filed a joint motion seeking to strike the venire, alleging an

underrepresentation of African-Americans. The individual defendants assert that they are all

African-Americans. The Court shortened the response time; the government filed a response and

the defendants filed a joint reply. The Court heard oral argument on May 14, 2012. The Court

indicated its intention to deny the motion in a written decision and jury selection was completed the

next day. The Court concludes that although the defendants' motion identifies a criticism that has

been leveled in the past against the apparent lack of diversity of jury pools in this district, the defendants have not established a right to relief, and certainly not the relief they have requested.

## I.

The jury venire in this case was assembled by following the procedures in the United States District Court for the Eastern District of Michigan's jury selection plan that was approved by the United States Court of Appeals for the Sixth Circuit. Under that plan, the district is separated into five divisions. The Detroit division draws jurors from the Michigan counties of Jackson, Lenawee, Macomb, Monroe, Oakland, St. Clair, Sanilac, Washtenaw, and Wayne. *See* E.D. Mich. Admin. Order No. 00-AO-083 § (d) (Dec. 26, 2000) (Juror Selection Plan). The process of assembling prospective jurors for trials was described in detail by another judge of this district in *United States v. Bates*, No. 05-81027, 2009 WL 5033928 (E.D. Mich. Dec. 15, 2009):

> The jury-selection process begins when the Eastern District's Jury Department obtains three lists from the Michigan Secretary of State: registered voters, licensed drivers, and holders of state-issued identification documents. Juror Selection Plan § (f); . . . [s]*ee also* 28 U.S.C. § 1863(b)(2) (a district must use "some other source or sources of names in addition to voter lists" if doing so is necessary to ensure representativeness and avoid excluding jurors on the basis of race, color, religion, sex, national origin, or economic status). The Jury Department provides the list of registered voters to Sutera Data Systems ("SDS"), a data-processing firm contracted to compile the Master Wheel. Juror Selection Plan § (g)(3) (Jury Department may hire outside contractors to implement the Plan) . . . . SDS determines the number of registered voters in each of the nine counties comprising the Detroit Division, and calculates each county's proportionate share of the Division's total voting population. Based on these figures, the Court issues an Administrative Order to create a new Master Wheel for the Division, in which it specifies the number of people to be drawn from each county for possible jury service. Juror Selection Plan § (h)(2) (voter-registration lists must be used to determine the proportion of jurors from each county) . . . .
>
> The Jury Department next provides the list of licensed drivers and holders of state-issued ID cards to SDS, with instructions to create the Master Wheel; it is to be filled with actual names of potential jurors. SDS begins by making separate lists of licensed drivers and state ID holders for each county in the Division. Next, for each

county, SDS merges the three lists (registered voters, licensed drivers, people with state-issued IDs) and eliminates duplicate names. . . . Finally, SDS selects names at random from the merged list for each county, based on the proportions set forth in the Administrative Order, to create the Master Wheel. . . .

In the next step, the Jury Department randomly draws 5,000 names from the Master Wheel and sends juror questionnaires to these people. *See* Juror Selection Plan § (i)(1) (Clerk of the Court decides how many names are necessary to maintain "an adequate number of names" in the jury wheel). At this point, questionnaires may fall into one of three categories: (1) "non responses," which are questionnaires never returned; (2) "undeliverables," questionnaires returned unopened by the Post Office; and (3) "completed" questionnaires filled out and returned by their intended recipients.

The Jury Department's procedure for following up on undeliverables and nonresponses is limited. If the Post Office provides a forwarding address for an undeliverable, the Department mails a questionnaire to the new address; if no address is provided, no further action is taken. . . . The Jury Department also sends follow-up questionnaires to nonresponses; however, there is no standard practice if the second mailing elicits no response. . . . Juror Selection Plan § (j).

The Jury Department then processes the completed questionnaires and decides who is not qualified or who should be excused. Noncitizens, convicted felons, and people who cannot read and write English, among others, are disqualified from jury service under federal law. Juror Selection Plan § (k); 28 U.S.C. § 1865(b). Active members of the armed forces, police and fire department members, and certain public officials are also exempt. Juror Selection Plan § (m); 28 U.S.C. § 1863(b)(6). The Eastern District also exempts people over 70, firefighters and ambulance crews, and persons who served on a jury within the last two years. Juror Selection Plan § (l). Once unqualified and exempt respondents are eliminated, what remains are the completed questionnaires of people who will make up the Detroit Division's Qualified Jury Wheel ("the Qualified Wheel").

In the final step, the Jury Department randomly draws a "jury pool" of about 400 people from the Qualified Wheel. . . . As they are selected, each person is assigned a number from one to 400; when they are called to service, jurors are called in sequence, starting with the number one. . . . A given jury pool remains on call for two weeks, and its members must be ready to report on a day's notice. . . .

Depending on the Court's trial calendar, any number of jury-pool members may be called upon to serve as jurors. After two weeks, regardless of how many members were summoned, the entire jury pool is retired and a new group of 400 is drawn to form a new jury pool. As jurors are summoned and pools retired, the Detroit Division's Qualified Wheel is gradually depleted. To replenish it, the Jury

-3-

Department draws new names from the Master Wheel and sends out more questionnaires. Those who are not excused or disqualified join the Qualified Wheel.

Each Master Wheel is kept in service for two years; during that time, the Jury Department draws as many names as the Court's trial schedule demands. . . . After two years, the Master Wheel is retired, even if some names remain which were never sent questionnaires or selected for placement in the Qualified Wheel. For example, the 2004-2006 Master Wheel contained 100,000 names, but the Jury Department mailed only 50,650 questionnaires; the remaining names were not used. . . . Records relating to old jury pools, Master Wheels and Qualified Wheels, are kept for a minimum of four years and are available for public inspection. Juror Selection Plan § (s)(2); 28 U.S.C. § 1868.

*Id.* at *2-4.

The venire was assembled for this trial on May 8, 2012. After initial introductory remarks, jurors who had heard of the case or the parties or their lawyers self-identified, and the Court conducted individual *voir dire* in a separate courtroom with those prospective jurors as to the effect of pretrial publicity. The parties posed their cause challenges, and the Court then reconvened in its courtroom to empanel jurors from the groups that were cleared for cause and who had not indicated prior knowledge of the case or parties.

The jury venire for this case was comprised of citizens from each of the counties in the Detroit division. The defendant have suggested the racial composition of the venire — at least with respect to African-Americans — did not reflect or even approximate the racial diversity of the district. The defendants have offered their view of the number of African-American jurors in the venire, but their information is entirely anecdotal, since no records are kept of the race identities of jurors, and no survey was conducted of the present venire. A casual observation of the venire revealed the presence of several dark-skinned individuals, but no formal count was made, nor was any attempt made by the parties or the Court to associate skin color with race. The absence of reliable statistical evidence notwithstanding, however, the defendants' criticism of the jury pool

echoes the lament of a colleague three years ago, who wrote: "Wayne County residents and African Americans are consistently and pervasively underrepresented in Detroit-Division juries, from one year, and one jury wheel, to the next." *Bates*, 2009 WL 5033928, at *17.

This Court attempted to address the issue of underrepresentation directly in a prior jury selection plan that was implemented in 1992. That plan used a method that has come to be known as the "subtraction method," wherein potential jurors who were members of a cognizable group that was *over*represented would be selected at random and *removed* from the jury pool. *See* 92-AO-035 (stating that "if the Court determines that a cognizable group of persons is substantially overrepresented in the qualified jury wheel, the Chief Judge shall order the Clerk to remove randomly a specific number of names so that the population of each cognizable group in the qualified wheel closely approximates the percentage of the population of each group in the area of each place of holding court, according to the most recently published national census report"). However, the Sixth Circuit held that the plan's "subtraction method" violated the Jury Selection and Service Act, 28 U.S.C. § 1861, *et seq.*, and the Fifth and Sixth Amendments. *United States v. Ovalle*, 136 F.3d 1092, 1100, 1105 (6th Cir. 1998). The court held that the district court's efforts to ensure that African-Americans were not underrepresented in the jury pool itself violated the command that "[n]o citizen shall be excluded from service as a grand or petit juror in the district courts of the United States . . . on account of race, color, religion, sex, national origin, or economic status." 28 U.S.C. § 1862. The court explained:

> The implementation of the jury selection plan is clearly not race neutral. Individuals were eliminated from consideration for jury service on the basis of their race. Any non-African-American had a chance of being eliminated from the jury wheel solely based on race. Additionally, as noted above, at the time of the selection of the jury wheel relevant to the appellants' cases, a random list of non-African-Americans was

removed from the jury wheel.  Excluding non-African-Americans in this manner discriminates against potential jurors solely because of their racial status.

*Ovalle*, 136 F.3d at 1105 (footnote omitted).

After the 1992 jury selection plan was struck down, this Court adopted the present plan. There is no suggestion by the parties in this case that the plan is other than race-neutral.  However, the results yielded by its implementation — at least with respect to the diversity of some of the panels — is unsatisfying in some cases.

The Court has studied the circumstances that have led to the current composition of jury venires and has reached some conclusions as to why it appears that African-American citizens appear to be underrepresented on some jury panels in the Detroit division.  The Court discovered that the rate of undeliverable jury questionnaires sent to addresses in Wayne County is proportionally higher than in other counties in the division by a significant number.  Because Wayne County has a larger minority and ethnic population, the impact of undelivered jury notices possibly manifests itself in the racial makeup of jurors in the Qualified Wheel.  Also, Wayne County has a larger percentage of citizens over age 70, who are exempt from jury service under the present plan. Those exemptions may also have an impact.  All of this, however, is merely conjecture.

To address those issues, the Court has proposed to modify the jury selection plan in a few important respects.  For one, at the 2011 October Judges' Meeting, the Bench approved a motion to modify the Court's Jury Selection Plan by sending a new questionnaire to a randomly-selected address in a zip-code area for every undeliverable form returned from that area.  Also, in addition to running more frequent National Change of Address checks, the Jury Department is in the process of implementing eJuror.  That program gives a prospective juror the option to complete the qualification questionnaire online.  Other jurisdictions that have implemented eJuror report increased

-6-

response rates. The Court also approved a motion to modify the Jury Selection Plan by eliminating jury service exemptions for those over age 70 and by raising the exemptions to those over age 73. The effect of those changes, however, have not impacted this case, and there is no guarantee that they will effect changes in the composition of the jury pools.

The problem came to a head in this case when the government used peremptory strikes to exclude an African-American woman from the principal jury and an African-American male as one of the alternate jurors. The defendants raised a challenge under *Batson v. Kentucky*, 476 U.S. 79 (1986), and the Court, after applying the three-step procedure, *see Miller-El v. Cockrell*, 537 U.S. 322, 328-29 (2003), determined that the government had not engaged in purposeful discrimination in making either strike.   The Court observed that many times lawyers exercise peremptory strikes based on intuition (which the defendants mischaracterized in their motion papers as "instinct"), and the government's justification for striking the first African-American woman was based on appearance and body language that conveyed to the government an attitude of hostility.  Based on the Court's own observations, the government's reasoning was plausible.  However, the issue would not have meant much if more African-American citizens were present in the jury venire to take the place of the struck jurors.

In the end, based on casual observation, the jury selected is comprised of ten Caucasians and two African-Americans in the principal jury and three Caucasians and one African-American as alternate jurors.

## II.

The defendants seek an order striking the jury venire and summoning another panel of jurors because the one they have does not represent a fair cross-section of the community in this district.

By making the motion midway through the jury selection process, the defendants face both a timing problem and a substantive one.

A.

Federal Rule of Criminal Procedure 12(b)(3) governs motions raising a Sixth Amendment fair cross-section challenge, and such motions must be filed before trial. *United States v. Boulding*, 412 F. App'x 798, 802 (6th Cir. 2011). The defendants filed their motion on the fourth day of *voir dire*. The Sixth Circuit has not published a decision fixing the time when trial begins under Rule 12(b)(3). But for the purpose of the Speedy Trial Act, trial commences with *voir dire*. *United States v. Crane*, 776 F.2d 600, 603 (6th Cir. 1985) (citing *United States v. Gonzalez*, 671 F.2d 441 (11th Cir. 1982)). The same holds true for constitutional speedy trial challenges, *United States v. Young*, 657 F.3d 408, 416 (6th Cir. 2011), for 18 U.S.C. § 3432 (which requires the government to provide a witness list to criminal defendants three days before the commencement of trial in capital cases), *United States v. Young*, 533 F.3d 453, 461 (6th Cir. 2008), and for Federal Rule of Criminal Procedure 43 (which requires the defendant's presence "at . . . every trial stage, including jury impanelment"), *United States v. Burke*, 345 F.3d 416, 422 (6th Cir. 2003). It follows, then, that pretrial motions attacking the jury composition also must be filed before *voir dire*. By that standard, the present motion was late.

A late motion, that is, one not raised before trial, is considered waived; however, the Court may grant relief from that waiver for good cause shown. Fed. R. Crim. P. 12(e). In order to show cause to excuse a waiver, a defendant must show that "some objective factor external to the defense impeded counsel's efforts to comply with the . . . procedural rule." *Murray v. Carrier*, 477 U.S. 478, 488 (1986). Although cause may be found upon a showing that "the factual or legal basis for a claim

-8-

was not reasonably available to counsel," "the mere fact that counsel failed to recognize the factual

or legal basis for a claim, or failed to raise the claim despite recognizing it, does not constitute cause

for a procedural default." *Id*. at 488, 486.

At oral argument, the Court understood the defendants to say that they could not have known

the racial composition of the jury venire until the jurors entered the courtroom. True enough.

However, the mere happenstance of an unrepresentative jury panel taken from a properly assembled

Qualified Wheel does not violate the Constitution. In order to prove a constitutional violation, the

defendants must show:

> (1) that the group alleged to be excluded is a "distinctive" group in the community;
> (2) that the representation of this group in venires from which juries are selected is
> not fair and reasonable in relation to the number of such persons in the community;
> and (3) that this underrepresentation is due to systematic exclusion of the group in
> the jury-selection process.

*Duren v. Missouri*, 439 U.S. 357, 364 (1979). In order to satisfy the second prong, the defendants

"must show more than that their particular panel was unrepresentative." *United States v. Allen*, 160

F.3d 1096, 1103 (6th Cir. 1998). Instead, the Court is required to examine the "venires" from which

"juries" are selected, suggesting a defendant's burden is not to demonstrate that his particular venire

is unrepresentative, but rather that venires in the district in general are unrepresentative. *See ibid*.

In order to satisfy the third prong, a defendant must show that "underrepresentation is inherent in

the selection process used." *Id*. at 1104. The defendants have neither alleged nor shown that the

Court's Jury Selection Plan systematically excludes minorities.

The current Jury Selection Plan has been in place since 2000. Under its prescriptions,

hundreds of juries have been selected for trials in this district. The defendants have not made any

showing that any of the elements of the defendants' *prima facie* case were "not reasonably available

-9-

to counsel" prior to the commencement of trial.  *Murray*, 477 U.S. at 488; *see also Bates v. United States*, No. 10-1094, 2012 WL 1071806, at *2 (6th Cir. Apr. 2, 2012) (rejecting a fair cross-section challenge to a jury selected under the present plan and noting that "a reasonable investigatory effort could have allowed Bates to present his Sixth Amendment challenge to the district court").  A showing that the defendants' particular venire was unrepresentative is neither necessary nor sufficient to establish the second element of the defendants' *prima facie* case, and therefore the defendants were not precluded from raising a fair cross-section challenge prior to trial on that basis.  The defendants argue that the particular facts of this case, including the circumstances surrounding their failed *Batson* challenge, make the under-representation of African-Americans in the venire more egregious.  Even if true, it does not change the fact that the factual and legal bases for the defendants' challenge were available prior tor trial.

## B.

Even if the defendants' motion were timely, the Court would deny it because it does not present a *prima facie* case for a fair cross-section violation.  The defendants have failed even to discuss the process by which jury panels are selected in this district, instead focusing on the jury panel in this case alone.  The manner in which jury selection has been conducted in this case can hardly be evidence of the *systematic* exclusion of African-Americans that is required to satisfy the third prong of the *Duren* test.  And although the defendants have pointed to a low number of African-Americans in this particular venire, they have not presented any information — statistical or otherwise — as to the percentage of the population of this district that is African-American or evidence that venires in this district as a whole are unrepresentative.

-10-

As the Sixth Circuit observed fourteen years ago, "it has long been the case that defendants are not entitled to a jury of any particular composition — only to a panel from which distinctive groups were not 'systematically excluded.'" *Allen*, 160 F.3d at 1103 (quoting *Taylor v. Louisiana*, 419 U.S. 522, 538 (1975)). "In the absence of a *per se* systematic exclusion, [which certainly does not exist in this case,] a defendant must establish that the challenged disparity is 'inherent' in the jury selection process itself." *Bates*, 2012 WL 1071806, at *4 (citing *Allen*, 160 F.3d at 1104).

The only possibilities for an argument of systematic exclusion are the higher rate of undeliverable jury questionnaires in Wayne County, and the relatively lower response rate from that same county. But the Sixth Circuit has rejected those grounds as speculative. *Ibid.* at *5 (noting that speculation that an issue might contribute to the underrepresentation of African-Americans is not enough to establish a prima facie Sixth Amendment violation" (citing *Berghuis v. Smith*, 130 S. Ct. 1382, 1395 (2010))). As for the lower response rate, this Court has adopted the practice of summoning non-responding jurors to show cause under 28 U.S.C. § 1866(g). Although that practice is forward-looking and would have no direct effect on the present trial, it underscores the absence of a systematic tolerance of habitual non-responders. And the *Bates* court has stated that "[n]on-responses . . . are not a problem 'inherent' to the jury selection procedures, but are the result of individual choice." *Bates*, 2012 WL 1071806, at *5. Other courts have reached the same conclusion. *See United States v. Cecil*, 836 F.2d 1431, 1447 (4th Cir. 1988) (observing that disparities attributable to "personal predilection" cannot form the basis of a fair cross-section claim). *Smith v. Berghuis*, 543 F.3d 326, 341 n.5 (6th Cir. 2008), *reversed on other grounds, Berghuis v. Smith*, 130 S. Ct. 1382 (2010) ("Courts, however, have been relatively uniform in finding that the failure to send additional letters to individuals who did not [] respond to questionnaires was not

'systematic exclusion' within the meaning of *Duren*.") (citing cases); *United States v. Orange*, 447 F.3d 792, 800 (10th Cir. 2006) ("Discrepancies resulting from the private choices of potential jurors do not represent the kind of constitutional infirmity contemplated by *Duren*."); *United States v. Craft*, 165 F.3d 28, 1998 WL 702348, at *3 (6th Cir. 1998) (table) (holding that the failure to respond to a jury summons is not a systematic defect in a jury selection plan, but a "private sector influence[]"); *United States v. Murphy*, No. 94 CR 794, 1996 WL 341444, at *5 (N.D. Ill. June 18, 1996) ("The jury selection system . . . is not excluding African-Americans as a group, but many African-American individuals are excluding themselves by not responding to jury questionnaires.").

Finally, it is worth mentioning that even if there were merit to the defendants' argument that an underrepresentation claim can focus narrowly on a particular jury pool, the remedy they seek would provide no guarantee of relief. The best the Court could do is assemble a new jury pool that was selected by the same method the defendants would have to criticize in order to succeed on their claim. The results from the defendants' perspective might be better, worse, or the same, which is all one could expect from a truly randomized selection method that hinges on the luck of the draw.

III.

The Court finds that the defendants' motion challenging the jury venire was filed out of time, and the method for selecting juries in this district, while not perfect, comports with the Constitution and the Jury Selection and Service Act.

-12-

Accordingly, it is **ORDERED** that the defendants' joint motion to strike the venire due to an underrepresentation of African-Americans [dkt. # 199] is **DENIED**.

s/David M. Lawson
DAVID M. LAWSON
United States District Judge

Dated:   May 31, 2012

**PROOF OF SERVICE**

The undersigned certifies that a copy of the foregoing order was served upon each attorney or party of record herein by electronic means or first class U.S. mail on May 31, 2012.

s/Deborah R. Tofil
DEBORAH R. TOFIL
